**UNITED STATES of America**

v.

**Joseph P. TRIOLI.**

**Cr. No. 69–178.**

United States District Court
D. Massachusetts.

Jan. 23, 1970.

Herbert F. Travers, Jr., U. S. Atty., Richard E. Bachman, Asst. U. S. Atty., for plaintiff.

Harry H. Toltz, Boston, Mass., for defendant.

### OPINION

CAFFREY, District Judge.

Defendant was indicted in a one-count indictment charging him with violation of 18 U.S.C. § 922(a) (6). The indictment charges that on or about March 28, 1969, in connection with the acquisition of a firearm, defendant knowingly made a false and fictitious written statement intended to deceive the dealer. The allegedly false statement consists of Mr. Trioli's failure to disclose the fact that he had been convicted of a crime punishable by a term of imprisonment exceeding one year. Such a conviction makes him ineligible to pur-

chase the firearm by reason of the provisions of 18 U.S.C. § 922(h).

■ The matter came before the Court on defendant's motion to dismiss the indictment. Defendant's principal contentions are that Section 922(a) (6) of Title 18 is unconstitutional because it is written so as to reach some wholly intrastate gun transactions and because it was not enacted pursuant to the Commerce Clause, or any other express or implied power granted to the Congress by the United States Constitution. Several pronouncements of the Supreme Court of the United States now make it clear that Congress does have the power to regulate not only interstate commerce but also some wholly intrastate activities which Congress finds have an effect on interstate commerce. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). In Heart of Atlanta Motel, the Supreme Court rejected an argument that the Civil Rights Act was unconstitutional because, as written, it could be used to cover and regulate the operations of a motel engaged in wholly intrastate activities. In so doing, the Court sustained the legislation on the basis of the Commerce Clause and, speaking for the Court, Mr. Justice Clark made the point that Congress had ample evidence that discrimination in intrastate activities burdens interstate commerce. The Court outlined Congress' power to regulate wholly intrastate activities:

"Thus the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin and destination, which might have a substantial and harmful effect upon that commerce." (379 U.S. at p. 258, 85 S.Ct. at p. 358)

Similarly, in Katzenbach, the Court held the Civil Rights Act constitutional. That case involved a restaurant which purchased approximately 46 per cent of its food from a local supplier who purchased it outside the state. Again, the Court looked to specific findings by Congress in enacting civil rights legislation:

"The record is replete with testimony of the burdens placed on interstate commerce by racial discrimination in restaurants. * * * Moreover there was an impressive array of testimony that discrimination in restaurants had a direct and highly restrictive effect upon interstate travel by Negroes." (379 U.S. at pp. 299–300, 85 S.Ct. at p. 381)

The Court also noted (p. 301, 85 S.Ct. 377) that Congress found racial discrimination to be a nationwide problem, and the Court concluded that in the light of these findings the Commerce power was an adequate constitutional basis to sustain the legislation. See, also, United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

In the instant case, Section 922(a) (6) of Title 18 was enacted as part of Title II of the Omnibus Crime Control and Safe Streets Act of 1968. A significant finding was made by Congress in Section 901(a) (1) of that Act, which sets out the basis of the statute as follows:

"The Congress hereby finds and declares—

(1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power;" (Emphasis added.)

U.S.Code Cong. and Adm.News, 90th Cong., 2d Sess., p. 270 (1968).

A similar finding is contained in Senate Report No. 1097 of the Senate Judiciary Committee (id., at 2112). It contains statistics demonstrating the ineffectiveness of local controls and the importance to the public safety of federal regulation of both interstate and intrastate firearm transactions:

"Two prime sources of firearms to criminals, juveniles, mental defectives,

and crime-bent individuals which involve access to guns through interstate routes are the mail-order common carrier source and the out-of-State, non-resident source. In both cases, the committee's record is replete with evidence substantiating that these sources of firearms for illicit purposes are major problem areas with which only the Federal Government can deal effectively.

"Because of interstate, nonresident purchases of firearms for criminal purposes, the laws of our States and their political subdivisions are circumvented, contravened, and rendered ineffective.

"As an example of this, the Massachusetts authorities have testified that 87 percent of 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring States. The result is that their stringent controls which are applicable to the sale of firearms and primarily handguns, are considerably reduced in effectiveness." (p. 2164.)

In considering the Gun Control Act of 1968, the House Committee made additional comments (House Report No. 1577):

"The subject legislation responds to widespread national concern that existing Federal control over the sale and shipment of firearms [across] State lines is grossly inadequate.

"Handguns, rifles, and shotguns have been the chosen means to execute three-quarters of a million people in the United States since 1900. The use of firearms in violent crimes continues to increase today. Statistics indicate that 50 lives are destroyed by firearms each day. In the 13 months ending in September 1967 guns were involved in more than 6,500 murders, 10,000 suicides, 2,600 accidental deaths, 43,500 aggravated assaults, and 50,000 robberies. No civilized society can ignore the malignancy which this senseless slaughter reflects." (p. 4413.)

The Court of Appeals for this Circuit had occasion to consider the use of the Commerce Clause by the Congress as the basis for the constitutionality of a law regulating interstate and intrastate transactions in drugs in the recent case of White v. United States, 395 F.2d 5 (1 Cir., 1968), cert. denied 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968). In the *White* case the Court of Appeals sustained the power of Congress to enact legislation under the authority of the Commerce Clause which would

"forbid the intrastate sale, delivery, or other disposition of the covered drugs, without requiring proof that interstate commerce is affected by the specific transaction * * *." (p. 7.)

In so doing, the Court relied heavily on the congressional findings and on the known dangerous character of drugs, observing that

" * * * depressant and stimulant drugs are not an inert, passive substance, which, after use, pass into the realm of statistics of consumption. They exert an influence on the consumer, which may spell danger or disaster for people or property from or in other states." (p. 7.)

While there may be differences of opinion as to whether traffic in guns or traffic in drugs poses the greater threat to the public safety, it is well within the power of Congress to find that because of the inherently dangerous nature of both, each, when used or abused in intrastate commerce, clearly affects interstate commerce. Consequently, the language of the Court of Appeals in *White* can be applied with equal force to the legislation involved in the instant case, since guns and drugs both have a very real potential for delayed harm:

"We think that Congress has adequately identified a situation where its dual objective of fostering proper interstate commerce and proscribing improper interstate commerce would be aborted without the power to regulate all intrastate commerce." (p. 7.)

I rule that 18 U.S.C. § 922(a) (6) is not unconstitutional but, on the contrary, is a valid exercise of Congress' power under the Commerce Clause.

Defendant's other contention, that the indictment is defective since it does not mention interstate commerce, is effectively disposed of by Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); United States v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953), since the indictment need not allege elements which are not an essential part of the offense charged.

Accordingly, the motion to dismiss is denied.